Stroud v. Casey.

S. M. STROUD AND ANOTHER V. MARTIN CASEY AND ANOTHER.

The plaintiff in execution, and his attorney who recovered the judgment, are deemed to be purchasers with notice of all errors and irregularities in the proceedings and judgment in the suit ; and where the plaintiff bought a tract of land at sheriff's sale on execution, under a judgment in his favor, and conveyed the same to the attorneys who procured the judgment, and the judgment was afterwards reversed by the Supreme Court for error therein, held, that the reversal of the judgment puts an end to the title so acquired.

It is perfectly well settled, that where there has been a sale under execution of lands or goods, and a stranger is the purchaser, *bona fide*, his title will not be affected by the subsequent reversal of the judgment.

Where the plaintiffs in an action of trespass to try title, recover judgment for the land against a defendant claiming the land, whose vendor is also made defendant, against whom the first named defendant recovers in the same suit a judgment for the purchase money paid by him ; on appeal, to this court, if it appear that the plaintiff's title is insufficient to recover on, and the judgment rendered in their favor be reversed, the judgment for the defendant against his co-defendant depending upon the former, will also be reversed.

APPEAL from Rusk. Tried below before Hon. C. A. Frazer.

This suit of trespass to try title to a certain tract of land in Rusk county, was begun by Jesse Forrest v. Thomas G. Aiken. During its progress Thomas Pitner and Martin Casey intervened and asked to be substituted as plaintiffs in the stead of Forrest, alleging that the plaintiff since the institution of this suit had conveyed the land in controversy to them. Pitner afterwards died, and Sampson Christie, executor of his will, became a party. The defendant Aiken suggested that he had purchased from S. M. Stroud, who was also made a party. Forrest alleged in his petition ownership to the land derived through a sale by the sheriff, on the third day of January, 1854, on an execution in his own favor issued against one Jesse Hitson, for two thousand dollars, founded on a judgment obtained by said plaintiff against said Hitson for said amount, in the year 1853; and that at the time of the levy said land was possessed and claimed by said Hitson; and that he bid one hundred dollars for said land, and paid

Stroud v. Casey.

the amount of his said bid to the sheriff, who made to him on the third day of January, 1854, a deed to the same; which was made a part of the petition.

Pitner and Casey alleged that after the institution of this suit, to wit, on the 23d day of May, 1854, the plaintiff, Forrest, sold and conveyed to them all his right, title and interest to the land sued for; and attached to their petition a deed thereto from said Forrest, as an exhibit, bearing date with the day of sale, as above stated. An amended petition filed by Pitner and Casey alleged matters of fraudulent combination between S. M. Stroud and Hitson, to defeat the title claimed by them under said sheriff's sale, which need not be stated in this place.

The defendant Aiken pleaded that he was a purchaser of the land in question for a valuable consideration, to wit, nine hundred dollars, from one S. M. Stroud, whose bond for title he still held; that on said purchase he had paid to Stroud four hundred and ten dollars, and prayed that Stroud be cited to defend this suit, and that if plaintiff recovered the land for judgment against Stroud for the amount so paid him.

Stroud entered himself a party defendant to defend the suit for his tenant, Thomas Aiken—he pleaded the general issue and answered specially, that "the pretended sale of said land under execution against one Jesse Hitson was illegal and void; that said judgment from which execution issued, was obtained by Jesse Forrest, the plaintiff in this suit, against Jesse Hitson, and afterwards, to wit, at the sitting of the Supreme Court at Tyler, the said judgment was reversed and declared erroneous, of which the said Jesse Forrest had notice." Said answer further alleges that the said land was bid off by said Forrest, and that no other consideration was paid than the credit entered by the sheriff on said execution, and that the same did not extinguish any indebtedness of said Hitson, there being then no subsisting judgment against him. Stroud answered further, denying that Hitson ever had title to said land, but that at the date of the sale and at the commencement of this suit, the title thereto was in himself.

Casey and Pitner's executor, S. Christie, by way of amendment, replied, that the judgment obtained by Forrest against

Hitson in the District Court at the Fall Term, 1853, was after-wards reversed in the Supreme Court, and was remanded for further proceedings, and said cause being removed to the county of Nacogdoches, at the Spring Term of the District Court for said county, A. D. 1857, a final judgment was entered against said Hitson for the sum of two thousand and five hundred dollars, and costs of suit, which judgment remains unsatisfied. The amend-ment or replication referred to a transcript of the record of said cause, filed therewith as a part thereof. Also that they purchased the land in good faith from Forrest, without notice of the reversal of the original judgment in favor of Forrest against Hitson at the time of making the purchase; that they paid to Forrest at the date of the deed to them the consideration recited therein.

The plaintiff on the trial introduced the original judgment and execution in his favor heretofore referred to, against Hitson; the former rendered in the District Court of Rusk county on the 26th day of November, 1853, for the sum of two thousand dollars; the latter issued upon said judgment on the 5th day of December, 1853, and levied upon the land the 9th day of December, 1853. The sheriff endorsed upon the execution a credit of one hundred dollars, by the sale of the land. The plaintiff introduced and read the sheriff's deed to said land. The only facts proved on the trial material to be recited under the view taken of the case by this court are, that Casey and Pitner were the attorneys for For-rest in his suit with Hitson; recovered for him the judgment; that they introduced and relied upon their deed from Forrest, dated May 23d 1854; that the judgment against Hitson, as was admitted on the trial, was reversed by the Supreme Court at Tyler A. D. 1854, after the sale by the sheriff; and it was proved that on another trial in the District Court of Nacogdoches county A. D. 1857, judgment was again rendered for the plaintiff, and for a larger amount, to wit, two thousand five hundred dollars and costs of suit.

The judge instructed the jury to find for the plaintiff if the land described was levied on, sold, bid off, &c., as alleged by the plaintiff, by virtue of an execution issued on the plaintiff's judg-ment against Hitson "before the judgment was reversed by the

Supreme Court, which is to be presumed unless the reverse appears
from the evidence." The jury were instructed further, in effect,
to find for the defendants, if Hitson had derived his title to the
land by a purchase from Stroud, taking his bond for title, and not
having paid the purchase money before the rendition of the judg-
ment against him under which the sheriff sold, they, Hitson and
Stroud, had rescinded and cancelled their contract and sale. They
were instructed, that, to entitle plaintiff to recover, he must have
paid a consideration, and if the amount of his bid was placed to
the credit of Hitson on the judgment, that was a sufficient con-
sideration to support the sale. The jury found for the "plaintiffs
or intervenors," the land in controversy against the defendants
Aiken and Stroud; and for the defendant Aiken against the de-
fendant Stroud nine hundred dollars. Thereupon the court ad-
judged that Martin Casey and Sampson Christie, executor of the
will of Thomas Pitner deceased, recover the possession of the land
in controversy; and by its decree divested said defendants of their
right, title and interest thereto, and vested the same in said in-
tervenors, and ordered a writ of possession to issue in accordance
with the judgment and decree aforesaid. The court further
adjudged that the defendant, Thomas Aiken, recover from said S.
M. Stroud nine hundred dollars.

A motion for new trial in behalf of the defendants being over-
ruled, they appealed to the Supreme Court, and among other
things assigned as error that the court erred in the instructions
given to the jury. It it is needless to notice other grounds
assigned in respect to the judgment in favor of Casey and Pitner's
executor. The defendant Stroud assigned as error that the court
erred in charging the jury that the defendant Aiken was entitled
to recover against him; in rendering judgment against him in
favor of Aiken upon the verdict and the facts of the case; and in
refusing to grant a new trial, as between Aiken and himself.

*W. Stedman,* for appellant S. M. Stroud.—1. It is assigned
for error that the court erred in its charge. There can be no
doubt that a purchaser under an execution issued upon a judgment
which is afterwards reversed, acquires the title of the defendant in

execution, and is not affected by the reversal, provided he is a stranger to the judgment; but it is equally well settled, that if the plaintiff in execution is the purchaser, the reversal of the judgment puts an end to his title, and he must restore the thing in specie, and not merely the value for which it was purchased, because he is chargeable with notice of every irregularity attending the proceedings. (Dater v. Troy T. & R. R. Co., 2 Hill, N. Y. Rep., 632; Woodcock v. Bennett, 1 Cowen, 737; Bank of the U. S., v. Bank of Washington, 6 Peters, 18; Hubbell v. Adm'r of Broadwell, 8 Ohio, 120, 128; see also Bac. Ab., vol. 3, pages 389–90.) The rule deducible from these authorities is, where lands have passed by a sale under execution to a stranger to the judgment, the owner of the land on reversal, must pursue the fruits of the sale in the hands of his antagonist; but when a party to the judgment purchases and continues to hold, this rule does not apply, because he is a party to the errors, and must restore the land to its original owner.

It must be admitted, however, that although the plaintiff in the judgment is not protected in his title, if the judgment is afterwards reversed, yet if he, before the reversal, sells to a stranger, who purchases *bona fide*, he is not affected by the reversal; but if the second purchaser is the agent or attorney of the plaintiff, he is in no better condition than his vendor, because he is equally notified of the irregularities and a party to the errors with him. (Simonds v. Catlin, 2 Caines' Cases, 62; Jackson v. Caldwell, 1 Cow., 644; Jackson v. Bowen, 7 Cowen, 21; Hogden v. Dunlap, 3 Bibb, 216; Sanders v. Riddle, 3 Mon., 139; Sydnor v. Roberts, 13 Tex., 598.) And the law is the same if the second purchaser, though not the agent or attorney of the plaintiff, has notice of the irregularities.

Now in this case it cannot be pretended that Pitner and Casey were not affected with notice, because they were not only constructively notified as the attorneys of Forrest, but they had actual notice, for they represented him in the Supreme Court when his judgment was reversed, and purchased from him eleven days after the reversal. I now propose to examine the authorities cited by appellee's counsel on this subject. The first is the case

of Nichols v. Ketchum, 19 Johns., 84. The case is not in point, for there Evertson had obtained a judgment against Frear, under which the property of the latter was sold. The plaintiff in execution became the purchaser, but paid nothing on his purchase, the amount being by arrangement between him and the sheriff credited on the execution. Evertson's execution was afterwards set aside and perpetually stayed, and the sheriff was directed to pay the proceeds of the sale in satisfaction of other executions in his hands, of which one was in favor of Nichols. The sheriff not having received the money from Evertson, returned Nichols' execution *nulla bona*, and Nichols sued him for a false return; and it was held by the court, that the sheriff was not liable, and that the only remedy was against Evertson by Frear, or the creditors.

The next case cited by the counsel is that of Moseley v. Gainer, 10 Tex., 393. The question we are considering was not before the court in that case, nor was it discussed, and the single remark made by the judge delivering the opinion which is quoted by the counsel, can only be regarded as an *obiter dictum*. Woodcock v. Bennett, 1 Cowen, 711, is the next case cited by the counsel. There the purchaser was no party to the judgment, and the distinction taken between purchases by parties and those by strangers, is fully recognized by the court on page 737.

The next case relied on by the counsel is that of Wyman v. Campbell, which, it is submitted, has no application to this question, for in that the question was, as to how far judicial sales are affected by mere irregularities.

2. It is also assigned for error, that the court erred in refusing to give the charges asked by the defendants. These charges in substance contain the proposition that Hitson had no such estate in the land as was subject to execution.

In the case of Dougherty v. Cox, 13 Tex. Rep., 209, the court say, that although under the statute an equitable claim to title or resulting trust may sometimes be subject to sale by execution, yet every equity is not subject to sale. "If, for instance, a purchaser had paid for the land, and taken a bond for title, the land would be subject to execution against the purchaser, because there would be nothing uncertain, nothing to be done on the part of the pur-

chaser, nor on the part of the vendor, but to make the title." If, however, other things were to be done by the parties, there would be no such equity as would be subject to the levy of an execution. And in the same case, the court say, that it cannot be contended that our statute goes further than the statute of 29th Charles II, in subjecting equitable and trust estates to execution. The case of Bogart v. Perry, 1 John. Chan. Rep., 51, is very similar to this, and there the Court of Chancery of New York held that such interest as Hitson had in the land is not subject to execution at law. The attention of the court is respectfully invited to that case.

The statute of North Carolina, passed in 1812, subjecting equitable and trust estates to execution, is an exact copy of the statute of 29th Charles II, and it has been uniformly held in that State, that "the interest of a vendee of lands, when the contract rests in articles of conveyance, is not the subject of sale under execution while the purchase money or any part of it remains unpaid." (Jennings v. Hardin, Busbee Eq. Rep., 275; Frost v. Reynolds, 4 Ired. Eq., 494; McKay v. Williams, 1 Dev. & Bat., Eq., 398, 405, &c.)

Hitson had no estate in the land, but only an interest in the contract. Forrest could have had no lien upon the land by force of his judgment, because at the date of its rendition, Hitson had paid only a small portion of the consideration money. Hitson was not therefore the absolute owner of the land, nor did he have absolute dominion over it, for Stroud the vendor had a lien upon it for the payment of the balance of the price, which was good not only against Hitson, but also against his creditors and subsequent purchasers. (Story Eq., 1220–21.) The payment of the purchase money is the essential constituent to title to real estates, and until it is paid, the land will not be subject to any other debts against the vendee. (Robertson v. Paul, 16 Tex., 472.) To vest an indefeasible title in the vendee, which will render the property subject to other claims against him, the purchase money must be paid. (Ib.) The price remaining unpaid, the vendor has the better right or superior title to the land. (Dunlap v. Wright, 11 Tex., 597; Howard v. Davis, 6 Tex., 174; Robertson v. Paul, 16 Tex.,

476.) If the land, by a regular proceeding in the courts, could have been condemned to be sold (as it could have been,) to satisfy this lien, then why could Hitson not have given it up to satisfy this debt in preference to other claims against him, without the necessity of being brought into court and put to costs and expense? Or, if Stroud could, by a proceeding in court against Hitson, have had the contract of sale rescinded, (as he doubtless could,) on account of the failure of Hitson to pay the balance of the purchase money, upon his (Stroud's) refunding the amount paid, then why could not the parties themselves have rescinded the contract of sale upon the same terms, without the necessity of resorting to the courts for aid, and especially when a court would have required Stroud, if seeking its aid, to have shown that he had, before coming before it, offered to do equity by refunding or offering to refund the amount paid? Why offer, if the offer cannot be accepted? Why this requirement outside of the court, if the matter cannot be adjusted without the interposition of the court? Where is the reason of forcing a party to come into court to compel another party to do what the other is already willing to do, and does not refuse to do?

Whether or not the plaintiff could have filed his bill to ascertain the interest of Hitson in the land, and subject it to the payment of his judgment, need not now be discussed, because that question is not before the court; the sole inquiry now is, was his interest subject to the execution, and the authorities above cited conclusively show that it was not. The sale of such uncertain and unascertained interests would invariably result in a sacrifice of the property, and such is the case here, for land worth $900 sold for $100. The plaintiff is seeking the aid of a Court of Equity, and it is thought that it will not be extended to one who claims under a purchase, the consideration of which is so grossly inadequate. (The case of Jackson v. Tuttle, 9 Con.)

*Martin Casey*, for the appellees.—The plaintiffs have nothing to do with the errors assigned by Stroud, as any contest between Aiken and Stroud cannot affect them.

Did the court err in the charge to the jury? He did not, if a

sale. under execution issued on a judgment before that judgment
is reversed vests a title in the purchaser at such sale. That the
purchaser obtains a good title under such circumstances, is fully
shown by the following cases :

In Nichols v. Ketchum, 19 Johns. R., 84, it appeared that
George B. Evertson recovered a judgment against John Frear;
that under that judgment all the property, both real and personal,
of Frear, was sold under execution in July, 1819, and Evertson,
by his agent, purchased the property of Frear at that sale, but
paid no money, the amount of the execution being more than the
bids. On the 4th of August, 1819, this execution in favor of
Evertson was set aside, and a perpetual injunction in that case
decreed ; and the sheriff ordered to pay what he had received un-
der that execution in satisfaction of other executions against
Frear.

On the 4th of August, 1819, an execution issued in favor of
Nichols and another, against the said Frear. The sheriff returned
*nulla bona*, and Nichols and the other instituted proceedings
against the sheriff for a false return, and that he had suffered the
property of Frear to be taken away by Evertson without paying
for them on a void sale.

The Supreme Court decided that the sale was valid ; that
Evertson was not compelled to pay the amount of his bid, but
might have that amount credited on the execution which issued in
his favor against Frear. The Supreme Court say, page 92, " It
would be unreasonable and injurious to debtors as well as credi-
tors to insist that the creditor on the execution should advance
money on his bid, when the sole object of the sale is to put
money in his pocket by paying a debt due to him. The sale was,
therefore, regular and lawful, as regards the sheriff."

Here was a sale under an execution, which was afterwards set
aside, and the plaintiff in that execution was the purchaser, and
he paid the sheriff nothing, yet the sale was held good. Forrest's
case is a stronger one against Aiken and Stroud. He paid the
amount of his bid to the sheriff, and .the sheriff so returns on the
execution, and that the amount of the bid was applied to the pay-
ment of the costs. It was also a discharge of a real indebted-

ness on the part of Hitson to Forrest, as the judgment afterwards obtained in Nacogdoches county shows.

The case of Mosely v. Gainer, 10 Tex. Rep., 393, is in point. Gainer had an execution against Littleberry Camp, issued on the 18th of June, 1852, which was levied on two negroes as Camp's property. Mosely claimed the property. It appears that these negroes had been previously levied on in the year 1851 by a former execution in the same case between Gainer and Camp; that Mosely, on that levy, had interposed his claim and failed. But before further proceedings the judgment on which the plaintiffs' execution had issued was reversed in the Supreme Court. An execution afterwards issued in the same case and was levied on the same slaves. Gainer contended that by his first execution and levy he acquired a lien on the slaves, and that the bill of sale introduced by Mosely from Camp, which was executed between the second judgment in the Supreme Court and the issue of the second execution, was in fraud of Gainer's rights, and to delay, hinder and defraud him in the collection of his debt from Camp.

This court, on page 396, say that the lien of the first execution did not exist, but "had a sale taken place previous to the reversal of the judgment, it would have been valid." And the court decided the bill of sale to be a fraud on the rights of Gainer.

In the case of Forrest v. Hitson, the sale did take place under execution and before the reversal of the judgment, and so it was a good sale on the authority of the above case, and the rescission of the sale between Hitson and Stroud, and the re-sale by both to Aiken was conclusively a fraud on the rights of Forrest. Forrest's judgment was entered on the 26th of November, 1853, and the bond from Hitson and Stroud to Aiken, bears date November 28, 1853. The judgment was constructive notice to Aiken and Stroud, and Hitson had actual notice. *Lis pendens* is constructive notice. (1 Tex. Rep., 326.) Stroud, without any necessity on his part to secure himself for the unpaid balance due to him on the land from Hitson, makes a re-sale with Hitson to Aiken for the sum due from Hitson, and takes two other notes for Hitson's sole use and benefit, in his (Stroud's) name. He could not be advancing

his own interest by taking these notes for Hitson's benefit, and could have no other object in view than to defeat Forrest's judgment against Hitson.

In Woodcock against Bennett, 1 Cowen, page 734, the Supreme Court of New York say : " It is well settled, that where a judgment is reversed for error, the sale under the execution shall not be avoided. (8 Coke, 192, Manning's case.) The reason given is, that great inconvenience would follow a contrary doctrine, so that none would buy of the sheriff in such case, and execution of judgments would not be done. In 8 Coke, 284, it was held that, if an erroneous judgment is given, and the sheriff by force of a *fieri facias* sell a term of the defendant and afterwards the judgment is reversed by writ of error, yet the term shall not be restored, but the money ; because the sheriff was commanded and compelled by the King's writ to sell it. (2 Bac., 506.) The uniform current of authority sanctions this doctrine."

The same doctrine is held in 1 Rob. La. Rep., page 95, Williams v. Gallien.

In Wyman v. Campbell, 6 Porter, 243, where a sale under an order of the Orphan's Court was attacked for irregularity, the Supreme Court say : .

" If a judgment is reversed for error in the record, the defendant can only obtain restitution of the money, while the purchaser shall hold the property sold for its satisfaction ;" and the same court say in the same case, page 242, in talking of sales under irregular executions :

" Who would consent to become a purchaser at such a sale, if he was to be made responsible for every irregularity in the proceedings of the court that ordered it ?"

Suppose Hitson, and he is the only man that could complain and attempt to recover from Forrest the amount for which the land sold, should attempt to recover the amount of the bid from Forrest. Forrest could offset the judgment entered at Nacogdoches ; at any rate under the above decisions, he could neither invalidate nor set aside the sale.

One of the points made in the assignment of errors is, that the purchaser at sheriff's sale in this case acquired no title, because

it did not appear that Hitson had paid the purchase money. This is not tenable, as appears from the following cases:

In Jackson, v. Scott, 18 Johns. Rep., 94, the defendant went into possession under the title of Elijah Scott, in August, 1817. In the January previous Hotchkiss recovered judgment against Elijah Scott. The land was sold by the surveyor-general to Elijah Scott in the spring of 1817, he being the highest bidder. The surveyor-general gave him a certificate, promising to execute a deed on his complying with the conditions of the sale. In August, 1817, Elijah Scott assigned this certificate to the defendant, who went into possession. Hotchkiss had the land sold by execution against Elijah Scott.

After the Supreme Court had declared that the sale by Elijah Scott was fraudulent as against creditors, they say, page 97 :

" The only question then is, whether, as Elijah Scott had only possession of the premises, with a contract from the surveyor-general entitling him to a conveyance on the payment of certain sums of money, which yet remained due, he had such an interest as might be levied on and sold on execution.　In the case of Jackson v. Graham, 3 Caines' Rep., 188, the plaintiff's title was deduced under a judgment, execution, and sheriff's sale thereon to the lessor, the defendant in the ejectment being the person against whom the judgment was rendered and execution issued ; and it was shown that before the entry of the judgment, the defendant had been and then was in possession.　The defendant offered to prove that one Day was the real owner of the premises, and that the defendant had no interest in them.　This evidence was excluded and the plaintiff recovered.　An application was made to set aside the verdict, and one ground taken was, that Graham was a mere tenant at will, and had no transferable interest either by his own act or the operation of law.　The court denied the motion and gave judgment for the plaintiff, saying that the defendant under an execution became *quasi* tenant to the purchaser.　We consider the purchaser entitled to all the right the defendant had in the premises and to the possession as part of his right, and that this would be of no prejudice to the real owner.　Whether Elijah Scott was seized or not seized of the premises, was not a subject

of inquiry. He was seized or had a chattel interest in the land liable to be sold. We have decided that a mere equitable interest cannot be sold; but if connected with the possession of the land, the legal interest, of which possession is evidence, may be sold."

In Jackson v. Tuttle, 9 Cowen, 233, Jesse Hills obtained judgment against Daniel Gridley before a justice of the peace for $50 82, including costs, on the 24th of March, 1820. On the 13th of October following an execution was issued on this judgment and levied on the land in controversy, and the lessor of the plaintiff purchased, Gridley being in possession when the levy was made. The plaintiff read the sheriff's deed and the judgment before the justice. Among other facts proved by the defendant Tuttle, he offered to read a deed from Gridley's wife for the land to him, dated April 1st, 1817. The court ruled this deed inoperative against Hills, as it had not been recorded, and he had no notice of it before the levy and sale. The defendant then read a mortgage from Gridley to him, dated September 12, 1815, for the land in suit. This mortgage was proved to be in fraud of creditors, and declared on that account inoperative. Tuttle went into possession after the levy and before the sale under an execution and purchase by Hills, the plaintiff in the justice's court, and was claiming adversely to Gridley. The Supreme Court decided that Gridley being in possession when the levy was made, he had such an interest as may be sold under execution, and he could not defeat the rights of the plaintiff by transferring that possession to Tuttle.

Hitson was in possession when the levy was made by Forrest, and even when the sale was made under execution, and could not, under the foregoing decision, defeat Forrest's right by the transfer of the title before the sale. In that case, also, Hills, the plaintiff, was the purchaser, as Forrest in this case; and the fraudulent mortgage was set aside, Hills being declared an innocent purchaser without notice; in this case the sale by Hitson & Stroud to Aiken should be disregarded as fraudulent for the benefit of Forrest, and he stands in the case of a *bona fide* purchaser under a judgment which was good until reversed.

In Wilson v. Palmer, (18 Tex. R., 592,) suit was brought in

trespass to try title to a tract of land. The defendant filed a sheriff's deed to D. J. Ransom, and a deed from Ransom to himself. The sheriff's deed recited a recovery before a justice of the peace againt the appellee, Palmer. The defendant gave notice that he would read those deeds in evidence. At the trial the plaintiff read as evidence those deeds without objection. And, as it appeared that the judgment in the justice's court was rendered without service on the defendant there, but the suit was by publication without any proper return of that fact, those deeds were held to pass no title out of Palmer, for want of jurisdiction before the justice. This court decided, that if the defendant had brought the suit in trespass to try title, he would not be bound to show that Palmer had any title to the land; that Palmer's possession of the land when the levy was made would be alone sufficient to recover. The court say, page 595: "Had the defendant, as the purchaser of the title acquired at the sheriff's sale, sued the plaintiff for possession, he would not have been required to prove that there had been any title in the plaintiff prior to the sheriff's sale. He could have claimed that whatever right the plaintiff had, was passed to him (the defendant) as purchaser through the sheriff's sale; and the judgment, execution and sale would have been conclusive as against the plaintiff, not only of his right in the property at the time of the sale, but that *prima facie* he had some right at that time subject to execution and sale."

The intervenors, Pitner & Casey, were *bona fide* purchasers for a valuable consideration from Forrest, and ought to be protected. There is no distinction between *bona fide* purchasers at judicial sales and *bona fide* purchasers from individuals at private sale. This is so determined in the Ohio Life Insurance Co. v. Ledyard, (8 Ala. R., 866.) Ledyard sold to Sawyers, Converse & Co. and Rufus Green a lot of land in Mobile, and received a mortgage to secure the payment of the purchase money. In 1837, Rufus Green made a deed for his interest in the lot to Robert Gordon to indemnify Robertson, Beal & Co. upon four notes for over $40.000, upon which they were endorsers. The notes were held by C. B. and T. J. Matthews. None of the parties had any knowledge of the mortgage to Ledyard when the deed of Green

48Y

was executed. Matthews brought suit, and subjected the property to the payment of the notes, and the Ohio Life Insurance Company became the purchasers. Ledyard brought suit to foreclose the mortgage, and made the Ohio Life Insurance Company parties to that suit. They pleaded that they were *bona fide* purchasers without notice, and the Supreme Court so held; because the payment or discharge of a pre-existing debt makes a party a *bona fide* purchaser for value. The intervenors paid Forrest, by giving him credit for the purchase money of the land, he being in their debt to a larger amount at the time of the purchase. And see 2 Hilliard on Vendors and Purchasers, page 734, where it is shown that there may be innocent purchasers *bona fide* at judicial sales, and that the interest of such purchasers will be protected although such sales may be set aside.

WHEELER, C. J.—It is perfectly well settled, that where there has been a sale under execution of lands or goods, and a stranger is the purchaser *bona fide*, his title will not be affected by the subsequent reversal of the judgment. It is equally well settled, that if the plaintiff in execution or his attorney is the purchaser, the reversal of the judgment puts an end to his title. "A man recovers land in a real action, and takes possession under an execution; or he acquires title to land by extent, or to goods by sale under execution, and the judgment is afterwards reversed. So far as he is concerned, his title is at an end, and the thing shall be restored in specie, not merely the value for which it was extended or purchased, but the thing itself. The only exception is where the sale is to a stranger *bona fide*, or where a third person has *bona fide* acquired some collateral rights from the party, before the reversal." (Per Cowen J., in Dater v. The Troy T. P. & R. R. Co., 2 Hill, N. Y. R., 633; Bac. Ab. tit. "Execution," M. 3.) The plaintiff in execution and his attorney who recovered the judgment, are deemed to be purchasers with notice of all errors and irregularities in the proceedings and judgment in the suit. That an attorney for the plaintiff in a suit purchasing under execution in it is a purchaser with notice of all irregularities in that suit, was decided in the case of Simonds v. Catlin, (2 Caine's Rep., 61,) in an opinion by

Kent, J.; and numerous cases to the same effect might be cited. But the doctrine is too well settled, both as to the purchase by the plaintiff in execution and his attorney who obtained the judgment, to require a further reference to authorities. The cases cited by counsel for the appellees do not controvert this doctrine.

In the present case, the plaintiff in execution, who is the plaintiff in this suit, was the purchaser of the property at the sheriff's sale; and the intervenors, who purchased from him, are his attorneys who obtained the judgment. Under these circumstances, they cannot occupy the attitude of strangers to the erroneous judgment, but are to be deemed purchasers with notice of the errors in the proceedings in that suit. The consequence is, that the reversal of the judgment puts an end to their title. The failure of title in the plaintiffs and intervenors will require a reversal of the judgment rendered in their favor, and the reversal of the judgment as to these parties will require the reversal of the judgment recovered by the defendant Aiken, against his co-defendant Stroud, as the latter judgment is dependent upon the former.

The judgment is reversed and cause remanded.

Reversed and remanded.